IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs June 6, 2017

**STATE OF TENNESSEE v. ELVIS HESTER**

**Appeal from the Criminal Court for Shelby County**
No. 15-05357    John W. Campbell, Judge

_____

**No. W2016-01822-CCA-R3-CD**

_____

A Shelby County Criminal Court Jury found the Appellant guilty of possession of marijuana, and the trial court imposed a sentence of six years. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction and the trial court's sentencing him for a Class E felony instead of a Class A misdemeanor as was required by the recent amendment to Tennessee Code Annotated section 39-17-418(e). Upon review, we conclude that the evidence was sufficient to sustain the Appellant's conviction. We further conclude that the trial court erred by sentencing the Appellant for a Class E felony, and we remand to the trial court for entry of a corrected judgment reflecting that the conviction is a Class A misdemeanor and that the accompanying sentence is eleven months and twenty-nine days.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Reversed in Part; Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Lauren Pasley, Memphis, Tennessee, for the Appellant, Elvis Hester.

Herbert H. Slatery III, Attorney General and Reporter; Breanne N. Hataway and Caitlin Smith, Assistant Attorneys General; Amy P. Weirich, District Attorney General; and Jose Leon, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

A Shelby County Grand Jury returned an indictment charging the Appellant with possession of contraband in a penal institution, introducing contraband into a penal institution, and possession of a controlled substance, namely marijuana.

At trial, Quintin Parks testified that he was a corrections officer with the Shelby County Division of Corrections. On June 25, 2014, he was assigned to the penal farm. That afternoon, the Appellant was escorted from where he was housed in the main building to the visitation room in the F building because he had a female visitor.

Officer Parks estimated that twenty to twenty-five inmates were in the visitation room, but he could not estimate how many visitors were present. Near the end of the scheduled visitation period, after the Appellant's visitor had left, Officer Parks was patrolling the visitation room when he noticed a "strong odor" of marijuana coming from the area where the Appellant was sitting. The closest person to the Appellant was sitting approximately three feet away. Officer Parks recalled that the Appellant had not smelled of marijuana when he first entered the visitation room. Officer Parks told Officer Beasley about the smell of marijuana, and the officers ushered the remaining visitors out of the room.

When only officers and inmates remained in the room, Officers Parks and Beasley approached the Appellant. The officers asked to see the bag of potato chips and the bag of candy the Appellant was holding. The officers looked inside the bags and found nothing, but they continued to smell marijuana. Officer Beasley then asked the Appellant to open his mouth. The Appellant refused and made a noise that sounded like "[r]rrnn." Officer Parks again asked the Appellant to open his mouth, and the Appellant again refused and repeated the noise. Officer Parks said that the Appellant "had his mouth puckered up" and that he realized the Appellant had something in his mouth. Officers Parks and Beasley handcuffed the Appellant. Thereafter, Officers Beasley and Coleman took the Appellant to the family room, which was next door to the visitation room.

On cross-examination, Officer Parks said that Officers Beasley, Bridgeforth, and Braxton were the other officers in the visitation room that day and that the visitation period lasted from 6:30 p.m. to 8:00 p.m. During visitation, each inmate was allowed visits from a maximum of three adults and four children. The visitors were each allowed "one hug and a peck once" the inmate entered the room, but no further touching was allowed. The visitors were permitted to obtain snacks or drinks from the vending machines for the inmates. Officer Parks said that around the time that he and Officer Beasley were handcuffing the Appellant, Officer Coleman was returning from a smoke break. When Officer Coleman helped Officer Beasley take the Appellant to the family room, Officer Parks's involvement with the Appellant ended.

Officer Parks acknowledged that the visitation room was monitored by security cameras but that he had not reviewed any video from the day in question.

Officer Phillip Beasley testified that he did not smell marijuana when the Appellant entered the visitation room. At the end of the visitation period, the Appellant was sitting in an "isolated" area. The officers were doing "routine security checks" when Officer Beasley noticed the odor of marijuana coming from the Appellant.

Officers Beasley and Parks approached the Appellant and asked to look into the bag of potato chips and the bag of candy he was holding. Finding nothing in the bags, Officer Beasley asked the Appellant to open his mouth. The Appellant said nothing but made a noise that sounded like "[h]uh." He appeared to have "a bulge in his – like in his throat like as he – it looked like he was trying to swallow something." When the Appellant was again asked to open his mouth, he refused and became "hostile." Officers Beasley and Parks restrained the Appellant, and he was taken to the family room. Officer Coleman came to the family room then escorted the Appellant to the penal farm's medical facility. Officer Beasley explained, "That's just a procedure like if – if there's a use of force, then we have to escort them to medical to be seen."

On cross-examination, Officer Beasley testified that Officers Braxton, Bridgeforth, and Parks were also in the visitation room with approximately twenty-five or twenty-six inmates. Officer Beasley recalled that Officer Parks smelled marijuana around the Appellant and that he told Officer Beasley about the odor. Officer Beasley then approached the Appellant and smelled marijuana. The Appellant twice refused the officers' requests to open his mouth, and he appeared to be trying to swallow something. The officers got the Appellant out of his chair, handcuffed him, and escorted him out of the visitation room and into the family room. Officer Beasley stayed with the Appellant in the family room for five or six minutes until Officer Coleman arrived to escort the Appellant to the medical facility. Officer Beasley said that he considered the Appellant's refusal "to deliver whatever he had in his mouth" to be a confrontation and that inmates were required to be taken to the medical facility following a confrontation. Officer Beasley said that the Appellant also was taken to the medical facility because "he had a bulge in his throat and he was trying to swallow, but it wouldn't go down, whatever it was."

Officer Beasley acknowledged that security cameras were in the visitation room. He had reviewed the video from the day in question but did not see the Appellant's visitor give the Appellant the contraband.

On redirect examination, Officer Beasley said that no security cameras were in the bathrooms in the visitation room. He agreed that the Appellant's visitor could have

gotten a bag of potato chips and a bag of candy from the vending machines and then walked into the bathrooms.

Officer Letravis Coleman testified that during the visitation period on June 25, 2014, he was smoking at a staff break area located outside the visitation room. He looked inside the visitation room and noticed that Officers Parks and Beasley were having a "small tussle" with the Appellant and went inside to assist. Officers Parks and Beasley told Officer Coleman that they had smelled marijuana on the Appellant and believed he had the contraband in his mouth. The Appellant refused to speak, and Officer Coleman could "see a bulge in his mouth." Officer Coleman handcuffed the Appellant and took him to the family room.

Thereafter, a supervisor instructed Officer Coleman and another officer to escort the Appellant to the medical facility in the main building. En route, they encountered Sergeant Gray and Lieutenant Jackson. Lieutenant Jackson told Officer Coleman to strip search the Appellant before taking him to the medical facility. Officer Coleman and the other officer took the Appellant to the processing room and told him, "'Don't make any sudden moves. If you have any contraband, go ahead and give it up now.'" Officer Coleman said that the Appellant was compliant and talking and that he assumed the contraband in the Appellant's mouth was gone.

Officer Coleman said that the officers in the processing room were Officer Sutton, Officer Lauderdale, Sergeant Gray, and Lieutenant Jackson. The officers instructed the Appellant to remove his clothing. Officer Coleman said that when the Appellant was standing in his underwear and socks, he noticed a small bulge in the Appellant's sock. The Appellant made a "sudden movement" towards his sock, and Officer Coleman saw the Appellant grab the bulge from the sock and try to put it in his mouth. Officer Coleman described the "bulge" as a "black ball" that "wasn't too big. It was something [the Appellant] could get down his throat." Officer Coleman sprayed a chemical agent in the Appellant's face to "prevent him from swallowing what was in the black unknown substance." However, the chemical agent did not subdue the Appellant, and Officer Coleman and another officer forced the Appellant to the floor. The black ball rolled away from the Appellant and was confiscated by a third officer. The officers restrained the Appellant and took him to the medical facility for evaluation.

On cross-examination, Officer Coleman said that the Appellant sat on a bench outside of the medical facility for less than fifteen to twenty seconds before being taken to the processing room. While the Appellant was on the bench, Officer Coleman did not see anything in the Appellant's mouth or throat. The Appellant was "compliant" and was talking with the officers. The Appellant's hands were cuffed behind his back. The handcuffs were removed when the Appellant was taken to processing and strip searched.

- 4 -

Officer Coleman said that he thought most of the penal farm, with the exception of the medical facility, was monitored by security cameras. However, he had not reviewed any security camera video, and he did not know whether the cameras were operating on the day of the incident.

When defense counsel asked if the object from the Appellant's sock was the size of an egg, Officer Coleman responded, "I don't recall the actual size to say it was an egg. I just know it was about that big. It was a small bulge. A normal sized bulge." When defense counsel asked Officer Coleman to describe the size for the record, Officer Coleman stated that it was the size of "a medium egg." Officer Coleman opined that the object was small enough to be easily swallowed "[i]f it's mushy . . . ."

Officer Christopher Sutton testified that he joined Officer Coleman outside of the F building to help escort the Appellant to the medical facility. Before the Appellant could be seen by medical staff, the shift commander determined that the Appellant should be strip searched. Officer Sutton said that the Appellant did not talk while outside the medical facility. However, once the officers and the Appellant arrived at the processing room for the strip search, the Appellant started talking.

Officer Sutton said that during the strip search, the Appellant was supposed to wait to undress until Officer Coleman told him which article of clothing to remove. When the Appellant had removed everything but his socks, underwear, and shirt, Officer Coleman instructed the Appellant to remove his shirt. Instead, the Appellant reached for his sock and threw the sock at Officer Coleman while he simultaneously "went to his mouth with his hand." Officer Sutton said that the Appellant's hand had been clenched in a fist and that he had not been able to see what was in the Appellant's hand. Officer Coleman attempted to take what had been in the Appellant's hand from the Appellant's mouth, and the Appellant "became combative to try to keep us from getting what he had in his mouth."

Officer Sutton said that Officer Coleman sprayed the Appellant with "Freeze +P. It's basically pepper spray." The spray did not subdue the Appellant, and the officers had to force him to the floor. Officer Sutton said that the "force of [the Appellant's] hitting the ground and the officer laying on top of him popped the ball out of his mouth and it hit my – and it hit me in the right boot." Officer Sutton described the object as a "black . . . electrical tape-wrapped ball." Officer Sutton picked up the ball to prevent the Appellant from retrieving it. Officer Sutton said the ball smelled like marijuana. Afterward, a Shelby County Sheriff's deputy came to the penal farm, retrieved the ball, and took it to the evidence room.

On cross-examination, Officer Sutton said that Sergeant Gray removed the black tape from the ball shortly after Officer Sutton retrieved the ball. Officer Sutton

acknowledged that he did not see the ball in the Appellant's sock but explained that the ball must have been hidden in the sock "because it wasn't in his hand and it wasn't in any other part of his body." Officer Sutton said the ball was not in the Appellant's mouth "because he was talking up to that point."

Officer Sutton said that after Officer Coleman sprayed the Appellant with pepper spray, Officer Coleman and Officer Lauderdale forced the Appellant to the floor. Officer Sutton estimated that the altercation lasted only one or two minutes. Thereafter, the Appellant was taken to the medical facility. Officer Sutton did not think the Appellant suffered any injuries as a result of the altercation.

Officer Sutton said that no video of the incident existed "because we strip search inmates in [the processing] area and it's illegal to put inmates on camera when they are nude." He explained, "There's a camera in the processing room, but it points towards where the inmates who are fully clothed sit. It doesn't point towards where we're strip searching the inmates."

When defense counsel asked about the size of the ball, Officer Sutton stated that the ball was "a little bit smaller than a baseball." Officer Sutton saw the Appellant put the ball in his mouth, and it "popped out of his mouth when he went to the ground after he was – after he was taken down by Officer[s] Coleman and Lauderdale." The ball rolled to Officer Sutton's feet, and Officer Sutton took the ball to "the sergeant's office." Officer Sutton said that the ball smelled like marijuana and that "it was a tightly wrapped black ball of tape . . . black electrical tape."

Tennessee Bureau of Investigation (TBI) special agent forensic scientist Lela Jackson testified that she tested the substance in the ball, discovered the substance was marijuana, and prepared a report on the results. The report reflected that the marijuana weighed 11.84 grams.

William Spears, the Deputy Administrative Security Operations Director/Interim Administrator of the Shelby County Division of Corrections, testified that the security video system in the penal farm "has a backup capacity of just 30 days."

On cross-examination, Director Spears said that the penal farm had security cameras but that the cameras "don't cover everything." He acknowledged that the cameras covered "[c]ertain angles" in the visitation room. Director Spears stated, "I don't know what happens to [the video] after 30 days, but the system will only retain it for 30 days." He did not know if a copy of a video could be made.

The Appellant chose not to testify or put on proof.

The jury found the Appellant not guilty of possession of contraband in a penal institution and introducing contraband into a penal institution but found him guilty of possession of marijuana. The Appellant waived his right to have the jury determine whether the Appellant had prior convictions, and at the sentencing hearing, the trial court determined that the conviction was the Appellant's fourth conviction of possession of a controlled substance. The court then determined the conviction should be a Class E felony, not a Class A misdemeanor, and sentenced the Appellant as a career offender to six years.

On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction and the trial court's sentencing him for a Class E felony instead of a Class A misdemeanor.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

In order to sustain the Appellant's conviction, the State needed to prove that the Appellant possessed a controlled substance, namely marijuana. Tenn. Code Ann. § 39-17-418(a). In the light most favorable to the State, the proof adduced at trial revealed that

on June 25, 2014, the Appellant met a visitor in the visitation room of the penal farm. At the end of the visitation period, Officer Parks patrolled the visitation room and noticed the smell of marijuana coming from the area where the Appellant was sitting. Officer Parks notified Officer Beasley of the smell, and the officers ushered the remaining visitors from the room. The officers then approached the Appellant and looked into the bag of potato chips and the bag of candy the Appellant was holding but found nothing. The officers continued to smell marijuana and noticed that the Appellant appeared to have something in his mouth. The officers repeatedly asked the Appellant to open his mouth, but he refused and became "hostile." During a search of the Appellant, he made a "sudden move" toward a bulge in his sock. The Appellant tried to put the bulge in his mouth. Officer Coleman sprayed the Appellant with a chemical agent. The chemical agent did not subdue the Appellant, and Officer Coleman and another officer forced the Appellant to the floor. The impact jarred the object from the Appellant's mouth, and the object rolled against Officer Sutton's boot. Officer Sutton retrieved the object, which was a ball of black electrical tape wrapped tightly around some marijuana, which weighed 11.84 grams.

On appeal, the Appellant's complaints regarding the sufficiency of the evidence are based primarily on inconsistencies in the testimonies of the officers. Specifically, the Appellant maintains that Officer Parks testified the Appellant refused to open his mouth, which implied the Appellant had something in his mouth, and that Officer Beasley testified the Appellant had a bulge in his throat which appeared to be something the Appellant was trying to swallow. In contrast, Officer Coleman testified that the Appellant did not have anything in his mouth and was talking. The Appellant further notes that Officer Coleman testified the Appellant's handcuffs had not been removed after they were placed on him in the visitation room and that he did not testify the Appellant made a move toward his sock before the strip search. The Appellant notes Officer Sutton testified that the Appellant threw his sock at Officer Coleman but that Officer Coleman did not mention the Appellant's throwing the sock at him.

The Appellant's complaint is essentially a challenge to the credibility of the State's witnesses. However, as our supreme court has stated, "The jury, as the trier of fact, is empowered to assess the credibility of the witnesses, to address the weight to be given their testimony, and to reconcile any conflicts in the proof." State v. Echols, 382 S.W.3d 266, 282 (Tenn. 2012) (citing State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008)). The jury heard the proof and clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000).

The Appellant next contends that "an acquittal for [the] possessing contraband to-wit marijuana in a penal facility count logically excludes a finding of guilt on the count of simple possession of marijuana." In other words, he contends that his conviction of

possession of marijuana was legally inconsistent with the jury's acquittal on the charge of possessing contraband in a penal facility.

Our supreme court has examined whether inconsistent verdicts entitle a defendant to relief and concluded that "'the overwhelming authority supports the rule that consistency between verdicts on separate counts of an indictment is not necessary.'" State v. Davis, 466 S.W.3d 49, 76 (Tenn. 2015) (citing Wiggins v. State, 498 S.W.2d 92, 93 (Tenn. 1973)). The court reasoned that inconsistent verdicts may be allowed to stand because

> "[t]he most that can be said in such cases is that the verdict shows that either in the acquittal or conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. . . .
>
> . . . .
>
> That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters."

Id. (quoting Wiggins, 498 S.W.2d at 93). Therefore, the court held that "'[c]onsistency in verdicts for multiple count indictments is unnecessary. . . . This [c]ourt will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned.'" Id. (quoting Wiggins, 498 S.W.2d at 93-94). Our supreme court emphasized that "'[t]he validity accorded to [inconsistent] verdicts recognizes the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation.'" Id. (quoting United States v. Zane, 495 F.2d 683, 690 (2nd Cir. 1974)). We conclude that any inconsistencies in the verdicts do not affect the sufficiency of the evidence of the Appellant's conviction.

In a related issue, the Appellant maintains that the evidence relating to the charge of possessing marijuana in a penal facility essentially was the same as the evidence relating to the charge of simple possession of marijuana. The Appellant asserts, however, that "[i]t appears inconsistent with the evidence that the jury could have decided that [the] Appellant was not in a penal facility at the time of the incident. Rather, the issue for the jury to decide . . . was most likely whether he was in possession of marijuana." Accordingly, the Appellant contends "that the facts of this case present yet another hybrid of the multi-sided issue of inconsistent verdicts," namely that the jury returned "mutually exclusive verdicts." The State responds that in Davis, our supreme court refused to adopt

the mutually exclusive verdicts doctrine and that the Appellant is not entitled to relief on that basis. We agree with the State.

In <u>Davis</u>, our supreme court noted that many state courts were confused regarding the "'difference between inconsistent verdicts and mutually exclusive verdicts.'" 466 S.W.3d at 74 (quoting <u>Heard v. State</u>, 999 So.2d 992, 1000 (Ala. 2007)). The court suggested the following definition:

> "[M]utually exclusive verdicts are the result of two positive findings of fact that cannot logically coexist. In other words, it is legally impossible for the State to prove the elements of both crimes. In order to determine whether the guilty verdicts are mutually exclusive as a matter of law, the alleged underlying offenses or acts must be carefully scrutinized. The two guilty verdicts are not mutually exclusive if no element of one crime necessarily negates an element of the other."

<u>Id.</u> (quoting <u>Heard</u>, 999 So.2d at 1004-05). The court observed that "[r]egardless of how courts label inconsistent verdicts, only a few state courts will grant relief to criminal defendants on that basis." <u>Id.</u> at 75. Our supreme court "agree[d] with the significant majority of jurisdictions that inconsistent jury verdicts are not a basis for relief." <u>Id.</u> at 76. Further, the court stated that "the few jurisdictions that grant relief on the basis of 'mutually exclusive' verdicts appear to struggle with both defining and applying the concept. We are disinclined to open the door to the increased confusion and increased litigation that arises from trying to parse a jury's inconsistent verdicts." <u>Id.</u> at 77. Therefore, we conclude that the Appellant is not entitled to relief on this basis.

Finally, the Appellant complains that the State "failed to present the videos that were supposed to record the incident in question." However, the record reflects that Officer Sutton testified that no video of the incident existed because the security cameras did not record in the area where strip searches were performed. Moreover, "[t]here is no requirement that the [S]tate introduce all proof at its disposal. The [S]tate may properly introduce only enough evidence that it believes will satisfy its burden of proof, provided it does not withhold exculpatory evidence." <u>State v. Augusta Thomas Robinson</u>, No. 03C01-9709-CR-00405, 1998 WL 283090, at *2 (Tenn. Crim. App. at Knoxville, June 3, 1998) (emphasis removed). We conclude that, even without the security video, the State adduced sufficient proof to sustain the Appellant's conviction of possession of marijuana.

II. Class of Conviction

- 10 -

As his final issue, the Appellant asserts that the trial court erred by finding the Appellant guilty of possession of a controlled substance, third or subsequent offense. At the time of the offense and trial, Tennessee Code Annotated section 39-17-418(e) (2014) provided that "[a] violation under this section is a Class E felony where the person has two (2) or more prior convictions under this section." However, Tennessee Code Annotated section 39-17-418(e) was amended with an effective date of July 1, 2016, the day of the Appellant's sentencing hearing, to provide that "[a] violation under this section is a Class E felony where the person has two (2) or more prior convictions under this section and the current violation involves a Schedule I controlled substance classified as heroin." The trial court found that the amended statute did not apply retroactively to the Appellant's case.

On appeal, the Appellant argues, and the State concedes, that the trial court incorrectly sentenced the Appellant for a Class E felony instead of a Class A misdemeanor. We agree. We note that Tennessee Code Annotated section 39-11-112 provides that

> [w]hen a penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, the offense, as defined by the statute or act being repealed or amended, committed while the statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense. Except as provided under § 40-35-117, in the event the subsequent act provides for a lesser penalty, any punishment imposed shall be in accordance with the subsequent act.

In State v. Thomas R. Davis, No. E2016-01622-CCA-R3-CD, 2017 WL 1483319, at *3-4 (Tenn. Crim. App. at Knoxville, Apr. 24, 2017), this court stated that

> [b]ecause Tennessee Code Annotated section 39-17-418(e) addresses enhanced punishment, the amendment applies to the [Appellant] if its application results in a "lesser penalty." See [Tenn. Code Ann.] § 39-11-112. The [Appellant] was charged in the indictment with simple possession of marijuana. Because the [Appellant's] current violation did not involve heroin, he was not subject to enhanced punishment for this conviction as a Class E felony pursuant to the amendment to section 39-17-418(e). Accordingly, the amendment resulted in a "lesser penalty," and the trial court erred in declining to apply the amendment

and in sentencing the [Appellant] to simple possession of a controlled substance as a Class E felony.

Although the [Appellant] was charged and tried under prior law, section 39-17-418(e) had been amended by the time of the [Appellant's] sentencing hearing and resulted in a "lesser penalty" for the [Appellant]. As a result, the amendment applied, and the [Appellant] was no longer subject to sentencing for the offense of simple possession of a controlled substance as a felony. The trial court erred in holding otherwise.

We conclude that the sentencing issue in the instant case is identical to the one in Thomas R. Davis. Accordingly, the trial court's imposition of a sentence for a Class E felony must be reversed and the case remanded for the imposition of a sentence of eleven months and twenty-nine days for a Class A misdemeanor.

### III. Conclusion

In sum, we conclude that the evidence is sufficient to sustain the Appellant's conviction. However, we reverse the enhancement of the Appellant's conviction to a Class E felony and remand to the trial court for entry of a corrected judgment reflecting that the conviction is a Class A misdemeanor with an accompanying sentence of eleven months and twenty-nine days.

_____
NORMA MCGEE OGLE, JUDGE